UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Campion, Barrow & Associates of Illinois, Inc.,
and Michael A. Campion,

      Plaintiffs,

v.                                                                                            Civil No. 07-3935 (JNE/JJK)
                                                                                        ORDER

City of Minneapolis and Mayor R.T. Rybak,

      Defendants.

---

James A. Campbell, Esq., and Brian W. Raum, Esq., Alliance Defense Fund, and Paul D. Baertschi, Esq., Tallen & Baertschi, appeared for Plaintiffs Campion, Barrow & Associates of Illinois, Inc., and Michael A. Campion.

C. Lynne Fundingsland, Esq., and Gregory P. Sautter, Esq., Minneapolis City Attorney's Office, appeared for Defendants City of Minneapolis and Mayor R.T. Rybak.

---

Plaintiffs Campion, Barrow & Associates of Illinois, Inc. (CBA), and Michael A. Campion bring this action against Defendants City of Minneapolis (the City) and Mayor R.T. Rybak. Plaintiffs assert claims, pursuant to 42 U.S.C. § 1983 (2006), for violations of Plaintiffs' First Amendment rights, as well as state-law claims for breach of contract. The case is before the Court on cross-motions for summary judgment. For the reasons stated below, the Court denies Plaintiffs' motion and grants in part Defendants' motion.

**I.    BACKGROUND**

CBA is an Illinois corporation. Since it was founded in the 1970s, CBA has become one of the leading providers of psychological services to police departments in the United States.

Campion is a licensed clinical psychologist and Chief Executive Officer and Senior Psychologist for CBA. From 1999 to 2005, Campion served on the board of the Illinois Family Institute (IFI), a non-profit organization that was started by James Dobson. According to

1

Campion, IFI promotes traditional family values by, among other things, advocating for pro-family legislation. According to Defendants, IFI is an anti-homosexual advocacy organization. In 1977, Campion co-authored an article called "When Was the Last Time You Hugged a Homosexual? A Biblical Perspective on Homosexuality and Its Healing." The article, which was printed in the Journal of the American Scientific Affiliation, states as its goal "to define the problem of homosexuality and recommend a treatment."

In December 2003, due in part to concerns about biased policing and low numbers of minority police officers, the Minneapolis Police Department (MPD) and an organization of community members, with the assistance of the Department of Justice and a federal mediator, entered into a Memorandum of Agreement (MOA). Among other things, the MOA provided for the creation of the Police Community Relations Council (PCRC), comprised of 18 community members, the police chief, and 11 MPD personnel selected by the police chief. The PCRC was intended to provide a forum for communication between the MPD and the communities it serves. The MOA assigns a variety of primarily advisory and supervisory responsibilities to the PCRC, including review and evaluation of the MPD's processes for psychological examination of police officers.

In 2004 or 2005, CBA began providing psychological services, including fitness-for-duty examinations and preemployment screening, to the MPD. At that time, the MPD was terminating its relationship with its previous provider of psychological services, Dr. Gary Fischler, purportedly because there was a public perception that Fischler's exams were disproportionately screening out minority applicants. Defendants deny that there was any actual bias in Fischler's work.

In the spring or early summer of 2006, members of the PCRC became worried that CBA's testing also had a disparate racial impact on the MPD. By May 18, 2006, at least some members of the PCRC were aware of a *City Pages* blog posting that mentioned past allegations of racial bias against CBA related to CBA's work for another city. The blog posting also mentioned Campion's affiliation with IFI, though the record suggests that PCRC members' initial concerns related primarily to racial bias. DRI Consulting (DRI), another psychological services firm, was hired to review CBA's work, and, in July 2006, DRI concluded that there was no evidence of bias.

Campion met with several members of the PCRC on August 22, 2006. At that meeting, Campion's affiliation with IFI was discussed. For example, according to notes taken during the meeting, one PCRC member expressed skepticism that it "was possible [for Campion] to eliminate biases, especially if [he is] part of a group that is against homosexuality." In addition, the deposition of Deputy Police Chief Donald Harris indicates that he attended the August 22 meeting and that he recalled "a lot of discussion about the anti-homosexual nature of [IFI]."

On August 23, 2006, the PCRC held a regularly scheduled monthly meeting. In their memoranda, Defendants admit that, at this meeting, PCRC members "expressed concerns about bias, based on Campion's views on homosexuality" and that "packets of research" regarding IFI and Campion were distributed by one PCRC member. Before the meeting was over, the PCRC approved a motion requesting that the MPD terminate its relationship with CBA, that new proposals for psychological services providers be sought, and that CBA's work be reviewed.

Following the August 23 meeting, at least one PCRC member contacted City Council Member Scott Benson regarding Campion and his connection with IFI. On August 24, 2006, Benson contacted interim Police Chief Timothy Dolan and others via e-mail and asked "[h]ow

3

did Dr. Michael Campion, who was a Board member of the Illinois Family Institute (a notoriously discriminatory and anti-gay group), become the psychologist for the Minneapolis Police Dept for screening new hires, etc.?" The record indicates that the e-mail was forwarded widely, including to all members of the City Council, and several council members responded with e-mails of their own to Dolan, inquiring about removing Campion and, in one instance, citing Campion's 1977 article on homosexuality. Assistant Police Chief Sharon Lubinski also emailed Dolan and Harris on August 24, 2006, writing "[t]his concerns me, we market and pride ourselves as a gay supportive city and police department, it seems like Dr. Campion has different values. We should discuss this soon."

News of Campion's affiliation with IFI generated media coverage and strong public reaction, and the MPD was inundated with calls and emails. On August 25, 2006, the MPD "suspended" its use of CBA for psychological services. The suspension was lifted in early September 2006. However, while CBA had planned on doing assessments for the MPD in October 2006, the MPD hired DRI to perform the assessments instead. The record indicates that Dolan, possibly with input from Harris, was responsible for these decisions.

On April 10, 2007, the City issued a Request for Proposals (RFP) for psychological services for the police department. The RFP identified selection criteria, including qualifications, experience, cost, "[o]rganization and management approach," and "[d]iverse staff, with cultural competencies." CBA, DRI, and Dr. Gary Fischler responded to the RFP. In June 2007, a five-person RFP committee, which included Lubinski, recommended that DRI be awarded a contract for psychological services. The proposed cost of CBA's services was less than the proposed cost of DRI's services, and CBA had more experience than DRI in providing psychological services to police departments. However, the RFP committee's notes state that

DRI rated better in diversity and transparency issues, and Defendants contend that Campion was rude and unresponsive to the committee's request for additional information. Dolan adopted the committee's recommendation, and DRI received the contract.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. First Amendment claims

Plaintiffs claim that Defendants violated their First Amendment rights by taking adverse action against Plaintiffs because they engaged in activity, including Campion's association with IFI, that is protected by the First Amendment.[1] In broad terms, "[t]he First Amendment . . . protects the right to be free from government abridgment of speech." *Ysursa v. Pocatello Educ.*

---

[1] While the Complaint states two separate counts alleging violation of Plaintiffs' First Amendment rights, both Plaintiffs and Defendants treat those counts as a single claim under a single legal framework alleging retaliation against Plaintiffs for exercise of rights protected by the First Amendment.

5

*Ass'n*, 129 S. Ct. 1093, 1098 (2009). In addition, the First Amendment protects "the freedom of an individual to associate for the purpose of advancing beliefs and ideas." *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 233 (1977). The government may not deny a benefit to a person on a basis that infringes First Amendment rights. *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996). To establish a prima facie case of retaliation for exercise of First Amendment rights, a plaintiff must allege and prove that "(1) she engaged in activity protected by the First Amendment; (2) the defendant took an adverse employment action against her; and (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action." *Davison v. City of Minneapolis*, 490 F.3d 648, 654-55 (8th Cir. 2007). Once the plaintiff has established a prima facie case, "the burden shifts to the defendant to demonstrate that the same . . . action would have been taken in the absence of the protected activity." *Id.* at 655. In addition, even if the plaintiff establishes a prima facie case and the defendant cannot demonstrate that the same adverse action would have been taken in the absence of the plaintiff's protected activity, the defendant government entity may still avoid liability if the infringement on the plaintiff's First Amendment rights is "reasonable," given the balance of interests involved. *See Int'l Ass'n of Firefighters, Local No. 3808 v. City of Kansas City*, 220 F.3d 969, 973-74 (8th Cir. 2000) (stating that the government's action must be "reasonable" but also that "intermediate scrutiny" should apply).

      1.     *Protected activity*

Defendants concede that Campion's association with IFI and past speech about homosexuality constitute activity protected by the First Amendment. While Defendants assert that they are unaware of any protected activity on the part of CBA, CBA was clearly associated with Campion. In the absence of any argument regarding CBA's association with Campion, the

6

Court declines to conclude that CBA's claim fails for failure to establish that it engaged in protected conduct. *Cf. O'Hare Truck Serv., Inc., v. City of Northlake*, 518 U.S. 712, 725-26 (1996) (holding that a corporation's status as an independent contractor did not preclude a lawsuit against the defendant city by the corporation and its owner alleging retaliation by the city against the corporation for protected activity by the owner); *Rimmer v. Colt Indus. Operating Corp.*, 656 F.2d 323, 327 (8th Cir. 1981) ("[S]peech that would otherwise be within the protection of the First Amendment does not lose that protection simply because its source is a corporation.").

    2.    *Adverse action*

The evidence shows that the MPD "suspended" Plaintiffs in late August 2006, hired DRI rather than CBA to perform assessments in October 2006, and awarded DRI a contract over CBA after the RFP process. The Court concludes that Plaintiffs have established adverse action. *See O'Hare Truck Serv.*, 518 U.S. at 715, 720 (indicating that removal of a contractor from a city's "rotation list of available towing companies" was an adverse action); *Perry v. Sindermann*, 408 U.S. 593, 596 (1972) (indicating that nonrenewal of a contract may constitute an adverse action); *Hughes v. Stottlemyre*, 454 F.3d 791, 796 (8th Cir. 2006) ("To constitute an adverse employment action, the employer's decision must effect a material change in the terms or conditions of employment.").

Defendants argue that a government defendant's refusal to award a contract to an independent contractor cannot constitute an adverse action for purposes of a First Amendment claim unless the plaintiff had a pre-existing commercial relationship with the government.[2] In *Board of County Commissioners v. Umbehr*, the Supreme Court held that independent

---

[2] Defendants repeatedly assert that Plaintiffs had no "reasonable expectation of work," but Defendants fail to identify authority that indicates such a standard is applicable.

7

contractors, like government employees, may assert First Amendment claims against government defendants. 518 U.S. at 673. The Court noted, however, that the case before it "concern[ed] the termination of a pre-existing commercial relationship with the government," and the Court specifically declined to "address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." *Id*. at 685; *see also O'Hare Truck Serv.*, 518 U.S. at 715 (indicating suit may be brought by "a regular provider of services").

In this case, Plaintiffs were first hired by the MPD in 2004 or 2005. They performed work for the MPD, or were considered eligible for work, through August 2006, at which time Plaintiffs were "suspended." Evidence suggests that Plaintiffs, with the encouragement of MPD officials, made plans to perform services for the MPD in October 2006. Assuming for present purposes that Plaintiffs must establish a pre-existing commercial relationship with the City, *cf. Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378, 386 (5th Cir. 2006) ("[T]he [Supreme] Court's analysis in *Umbehr* leads us to conclude that the Court would not require a contractor to have a prior relationship with a governmental entity before being able to assert a First Amendment claim . . . ."); *Wishnatsky v. Rovner*, 433 F.3d 608, 612 (8th Cir. 2006) ("The [Supreme] Court has never held . . . that a public entity may exclude bidders or applicants for government contracts based solely on their views, and that remains an open question."), the Court concludes that they have made a showing sufficient to survive summary judgment, *see Heritage Constructors, Inc. v. City of Greenwood*, 545 F.3d 599, 601-02 (8th Cir. 2008) (holding that the plaintiff, which had performed on a contract with the defendant municipality in 1999 and 2000, could assert a claim for the defendant's refusal to award a contract in 2005).

### 3. *Protected conduct was a substantial or motivating factor*

Defendants argue that the decision to stop using Plaintiffs' services in 2006 was not directly motivated by Plaintiffs' protected conduct but was instead motivated by concerns about bias, which were eventually proved to be unfounded, and by the public's perception that Plaintiffs' work was biased. The distinction Defendants attempt to draw is irrelevant to the question of whether protected conduct was a substantial or motivating factor behind any adverse actions. *See Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006) ("[T]he . . . dichotomy between the defendants firing the plaintiffs 'out of a concern for potential disruption' as against their doing so 'for reasons of public perception' or 'in response to the content of plaintiffs' speech' is a false one." (citation omitted)). Here, any concerns that Defendants had about bias and public perceptions of bias against homosexuals stemmed from Plaintiffs' protected conduct. Accordingly, Defendants have effectively conceded that Plaintiffs' protected conduct was a motivating factor behind the MPD's decision to stop using Plaintiffs' services in 2006. *See id.* at 175 (indicating that there was no dispute that the plaintiffs' expressive activity was the motivating factor behind their dismissals where the defendants contended that they permissibly discharged plaintiffs because their expressive activities interfered with government operations).

With respect to the MPD's decision, following the RFP process, to award a contract to DRI rather than CBA, the RFP committee's stated reasons for its recommendation were unrelated to Plaintiffs' protected conduct. However, because CBA had advantages in cost and experience, because Campion's association with IFI was known to most members of the RFP committee, because Campion's association with IFI received a great deal of negative public attention, and because the RFP committee included at least one individual who had previously reacted negatively to Campion's association with IFI, a reasonable jury could, but need not,

9

conclude that the RFP committee's stated reasons were pretextual. The Court concludes that genuine issues of material fact remain as to the MPD's motivation for awarding a contract to DRI rather than CBA.

*4. Same decision*

Defendants argue that public perception that Plaintiffs' work was biased against homosexuals would have caused them to end their relationship with Plaintiffs regardless of the cause of that public perception. However, there is no evidence of any public perception that Plaintiffs were biased against homosexuals other than that which arose from Plaintiffs' protected activities. Accordingly, Defendants fail to demonstrate that, in the absence of Plaintiffs' protected activities, adverse action would have been taken against Plaintiffs on the ground that the public perceived them to be biased against homosexuals. In this case, public perception of bias against homosexuals is not an independent reason for adverse action against Plaintiffs but is instead part of a justification for adverse action that must be addressed by balancing Plaintiffs' First Amendment rights against Defendants' interests in effective provision of services, a matter that is taken up below. *See id.* at 180 ("[E]ven after demonstrating that a concern for disruption was its true motivation, the Government must also persuade a court that its interest in preventing disruption outweighed the employee's individual free speech interests.").

To the extent that Defendants suggest that, as with Dr. Gary Fischler, the MPD would have ended its relationship with Plaintiffs due to an erroneous public perception that Plaintiffs' work was racially biased, the Court concludes that issues of fact remain. Accusations of racial bias against Plaintiffs surfaced months prior to their suspension, which occurred only after attention turned to Campion's affiliation with IFI. *See Sexton v. Martin*, 210 F.3d 905, 915 (8th Cir. 2000) (holding that a question of material fact remained regarding the defendants'

motivation for terminating a plaintiff where the record showed that the plaintiff "was discharged six days after the [protected activity], purportedly for an accident that occurred some six months prior").

Defendants argue that they would have hired DRI following the RFP process rather than CBA regardless of Campion's affiliation with IFI. As noted above, issues of fact remain regarding the MPD's actual motivations for awarding the contract to DRI rather than CBA, and the record suggests that neither DRI's proposal nor CBA's proposal was superior with respect to all relevant criteria. Accordingly, fact issues remain regarding whether Campion's affiliation with IFI had a material effect on the RFP committee's recommendation.

   5.   *Balance of interests*

A government employer may interfere with the speech of an employee or contractor provided that "the interests of the [employee or contractor], as a citizen, in commenting upon matters of public concern" are outweighed by "the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Similarly, "the government, when acting in its role as employer, may interfere with its employees' [or contractors'] associational rights," but only if the government's "interests in the efficient and effective provision of public services" outweigh the employees' or contractors' interests in exercise of their associational rights. *Int'l Ass'n of Firefighters*, 220 F.3d at 974; *see Norbeck v. Davenport Cmty. Sch. Dist.*, 545 F.2d 63, 67 (8th Cir. 1976). While the analysis varies slightly depending on whether speech or associational rights are at issue, the same basic principles apply in either case, and the parties do not suggest that material distinctions exist between the two contexts. *See Int'l Ass'n of Firefighters*, 220 F.3d at 973 ("These same considerations [at issue in the *Pickering* balancing analysis] should

11

inform the analysis of whether a government's infringement of its employees' associational rights is reasonable." (citation omitted)); *cf. Locurto*, 447 F.3d at 173 ("[B]ecause First Amendment retaliation doctrine must reconcile our dual traditions of at-will employment and of robust license to speak freely without Government sanction, neat doctrinal boxes are of unusually limited usefulness.").

"Although the balancing of interests is a matter of law for the district court, the underlying factual questions should be submitted to the jury, generally through interrogatories or a special verdict form," *Belk v. City of Eldon*, 228 F.3d 872, 881 (8th Cir. 2000), and the inquiry is "highly fact-specific," *id.* at 880. Factors relevant to the Court's analysis include the nature of the government's responsibilities, the nature of the plaintiff's responsibilities as an employee or contractor, the nature of the plaintiff's exercise of his or her First Amendment rights, and the degree to which exercise of the plaintiff's exercise of his or her First Amendment rights impeded the government's operations. *See id.* at 880-81. In addition, "when balancing an employee's interest against an employer's interest, the constitutional standard takes proportionality into account." *Sexton*, 210 F.3d at 913 (quotation marks omitted). The more an employee's or a contractor's exercise of First Amendment rights involves matters of public concern, the greater the government's showing that the exercise of those rights is likely to impede its operations must be before those rights can be restricted. *See id*.

Plaintiffs contend that this balancing analysis is inapplicable to this case because it applies only when a government defendant presents evidence that a plaintiff's exercise of First Amendment rights has created actual disharmony within the workplace. *See Belk*, 228 F.3d at 881 ("In cases where the public employer cannot demonstrate that the employee's speech disrupted the workplace . . . the court need not proceed to a specific *Pickering* factor analysis

absent exceptional circumstances."). Plaintiffs' reading of the law is too narrow. While many cases examine workplace disharmony caused by the exercise of First Amendment rights by government employees, the Court discerns no reason why only the government's interest in harmony within the government workplace should be considered constitutionally significant. To the contrary, case law indicates that, while workplace harmony is relevant, the government's interest should be construed so as to broadly encompass the effective provision of services to the public. *See, e.g.*, *id.* at 880 (indicating that an employee's First Amendment rights should be balanced against the "interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," which "requires full consideration of the government's interest in effective and efficient fulfillment of its responsibilities to the public" (quotation marks omitted)). Assuming that a government defendant must come forward with more than speculative predictions that an employee's protected activities will impede effective provision of services, *cf. Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (stating that a government employer may in some circumstances restrict "speech that has some potential to affect the entity's operations"); *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion) ("[W]e have given substantial weight to government employers' reasonable predictions of disruption . . . ."); *Connick v. Myers*, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity for [a government] employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."), the Court concludes that Defendants have made a showing sufficient to warrant application of the relevant balancing analysis.

Defendants argue that public perception that Plaintiffs were biased against homosexuals undermined the effective provision of services by the MPD, and that the government interest in

13

effective police operations justified any interference with Plaintiffs' First Amendment rights. Plaintiffs contend that, as a threshold matter, Defendants' purported justification is illegitimate and cannot be balanced against Plaintiffs' First Amendment rights. Plaintiffs argue that Defendants' "public perception" justification gives effect to private individuals' prejudiced assumptions about Plaintiffs, assumptions that are based on Plaintiffs' protected activities. Plaintiffs, citing a plethora of cases, claim that the government may not give effect to the discriminatory designs of private individuals. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (indicating that a city may not use zoning ordinances to give effect to private biases against the mentally retarded); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) (indicating that the government cannot permissibly consider the private racial prejudices of the citizenry when making child custody determinations); *United States v. Sch. Dist. of Omaha*, 521 F.2d 530, 538 n.14 (8th Cir. 1975) (indicating that a school district may not effectuate the discriminatory designs of private individuals by persisting in maintaining racially segregated teaching faculties); *United States v. City of Black Jack*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1974) (indicating that a zoning ordinance cannot be enacted to effectuate the racially discriminatory intentions of private individuals); *Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) (indicating that government officials may not effectuate the racially discriminatory intentions of private individuals by denying a building permit and zoning change).

The cases cited by Plaintiffs, however, do not involve First Amendment rights or the limitations that may be placed on the rights of public employees or contractors. *Cf. Garcetti*, 547 U.S. at 418 ("A government entity has broader discretion to restrict speech when it acts in its role as employer . . . ."). While a government employer may not take adverse action against an employee or a contractor merely because it disagrees with the content of his or her speech, *see*

*Umbehr*, 518 U.S. at 675 ("The First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern."); *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."), pertinent case law suggests that Defendants' asserted justification—the disruptive effect that Plaintiffs' protected conduct had on provision of government services—is a cognizable one. *See Dible v. City of Chandler*, 515 F.3d 918, 928-29 (9th Cir. 2008) ("Those worries [about a heckler's veto] do not directly relate to the wholly separate area of employee activities that affect the public's view of a governmental agency in a negative fashion, and, thereby, affect the agency's mission."); *Locurto*, 447 F.3d at 178-80 (indicating, in a case involving termination of a police officer who engaged in racist public conduct, that in some circumstances the government may justify taking adverse action against an employee when the provision of government services is disrupted by of the public perception of the employee's expressive conduct); *McMullen v. Carson*, 754 F.2d 936, 940 (11th Cir. 1985) ( "[A] law enforcement agency does not violate the First Amendment by discharging an employee whose active participation in an organization with a history of violent activity, which is antithetical to enforcement of the laws by state officers, has become known to the public and created an understandably adverse public reaction that seriously and dangerously threatens to cripple the ability of the law enforcement agency to perform effectively its public duties."); *cf. Rankin*, 483 U.S. at 391 (citing with apparent approval *McMullen v. Carson* with the parenthetical description "clerical employee in sheriff's office properly discharged for stating on television news that he was an employee for the sheriff's office and a recruiter for the Ku Klux Klan").

Regarding the actual balance between the government's interest in effective provision of services and Plaintiff's First Amendment interests, genuine issues of material fact preclude the Court from granting summary judgment to any party. For example, the parties agree that news of Plaintiffs' protected activities engendered public controversy. However, the strength of the effect of that controversy on provision of police services, and therefore the strength of Defendants' interest, cannot be gauged without factual judgments about the strength of the negative public sentiment and the relationship of the public controversy to factors such as the history of bias in the MPD and the fact that there was no indication that Plaintiffs' work was actually biased. The Court observes, at this preliminary stage, that Plaintiffs' First Amendment interests appear to be strong.

### 6. *First Amendment claims against Rybak*

Defendants seek dismissal of the First Amendment claims asserted against Rybak in his personal capacity. At the motion hearing, Plaintiffs agreed to dismiss those claims. *Cf. Sexton*, 210 F.3d at 914 ("[W]hen *Pickering*'s fact-intensive balancing test is at issue, the asserted First Amendment right can rarely be considered clearly established for purposes of the *Harlow* qualified immunity standard." (quotation marks omitted)). Accordingly, the Court dismisses Plaintiffs' First Amendment claims asserted against Rybak in his personal capacity.

**B.  Contract Claims**

Plaintiffs assert that they had a contract, either oral or written in e-mail form, to provide psychological services in October 2006 and that the contract was breached when Defendants instead hired DRI to do that work. Defendants argue that the Minneapolis Code of Ordinances requires that contracts be in written form and approved by the City Attorney. *See, e.g.*, Minneapolis, Minn., Code of Ordinances tit. 2, ch. 18, § 105 (May 28, 2004) ("All other

contracts not regulated by section 18.100, including but not limited to contracts for professional services . . . shall be in written form approved by the city attorney. Contracts made and executed pursuant to Chapter 4, Section 25, of the City Charter shall be in written form approved by the city attorney."). Plaintiffs do not make any legal argument as to why these ordinances do not apply or as to how they may nevertheless have an enforceable contract with the MPD. Instead, Plaintiffs assert that they are entitled to recovery under a promissory estoppel theory. Plaintiffs, however, fail to explain how any reliance on promises from the MPD was reasonable in light of the existence of ordinances governing City contracts, *see Heidbreder v. Carton*, 645 N.W.2d 355, 371 (Minn. 2002), and Plaintiffs have not demonstrated that they suffered any detriment because of any such reliance, *see Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000). Accordingly, the Court dismisses Plaintiffs' contract claims.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiffs' Motion for Leave to File a Supplemental Memorandum in Support of Motion for Summary Judgment [Docket No. 65] is GRANTED. The parties' supplemental memoranda have been considered by the Court.

2. Defendants' Motion for Summary Judgment [Docket No. 31] is GRANTED IN PART and DENIED IN PART.

3. Plaintiffs' Motion for Summary Judgment [Docket No. 39] is DENIED.

4. Plaintiffs' claims against Rybak in his personal capacity are DISMISSED WITH PREJUDICE.

5. Plaintiffs' contract claims are DISMISSED WITH PREJUDICE.

Dated: August 11, 2009

                                                    s/ Joan N. Ericksen
                                                    JOAN N. ERICKSEN
                                                    United States District Judge